### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

**THE PENINSULA AT ST. JOHN'S CENTER CONDOMINIUM ASSOCIATION, INC.**

        **Plaintiff,**

**v.**                       **Case No.  3:22-cv-792-ACC-LLL**

**AMERISURE INSURANCE COMPANY, and AMERISURE MUTUAL INSURANCE COMPANY,**

        **Defendants.**

_____

### ORDER

This cause comes before the Court on cross-motions for summary judgment: (1) Defendants Amerisure Insurance Company and Amerisure Mutual Insurance Company's (collectively, "Amerisure") Motion for Summary Judgment Against Plaintiff (Doc. 308), to which Plaintiff the Peninsula at St. John's Center Condominium Association, Inc. (the "Association") responded in opposition (Doc. 322), and Amerisure filed a reply (Doc. 338); and (2) the Association's Motion for Partial Summary Judgment (Doc. 310), to which Amerisure responded in opposition (Doc. 317), and the Association filed a reply (Doc. 339). For the following reasons,

the Court will grant Amerisure's Motion for Summary Judgment and will deny the Association's Motion for Partial Summary Judgment.

## **INTRODUCTION**

This case arises out of the construction of a condominium project called The Peninsula at St. John's (the "Project") located in Jacksonville, Florida occurring from 2005 through 2008. (Doc. 308-1 ¶¶ 15–16). The Association previously litigated the underlying construction defect issues years ago in a state court lawsuit brought against the general contractors, sureties, and subcontractors involved in the original Project construction (the "Underlying Litigation"). [1] The Underlying Litigation culminated in a series of settlement agreements, including one nearly global agreement for approximately $39 million between the Association and some of the contractors, sureties, and subcontractors working on the Project. Separately, the Association settled claims for additional millions of dollars with some other subcontractors of Auchter Company, Inc. ("Auchter"), the first general contractor working on the Project before it defaulted. In addition to the foregoing settlement agreements, the Association entered into a *Coblentz* agreement with Auchter in the amount of $8.5 million in damages.[2] (Doc. 308-37).

---

[1] *The Peninsula at St. John's Center Condominium Association, Inc. v. The Auchter Company, et al.*, Case No. 2013-CA-6582, Circuit Court of the Fourth Judicial Circuit in and for Duval County, Florida.

[2] "The term '*Coblentz* agreement' refers to a settlement agreement entered into between an insured and a claimant in order to resolve a lawsuit in which the insurer has denied coverage

In a *Coblentz* agreement, following an insurer's alleged wrongful refusal to defend, the insured (in this case, Auchter) negotiates a settlement with the claimant (in this case, the Association) in an underlying action wherein the parties agree to entry of a consent judgment fixing liability and damages amounts. As part of this agreement, the insured (Auchter) assigns to the claimant (the Association) the right to collect in a subsequent lawsuit from its insurance company (Amerisure). This is that subsequent lawsuit. The Association, standing in the shoes of Auchter, seeks to collect $8.5 million under commercial general liability ("CGL") policies issued by Amerisure to Auchter effective during some, but not all, of the Project's construction. The Court must decide whether the Association can recover from Amerisure under this agreement.

## FACTUAL BACKGROUND

### I.    Construction of the Peninsula Project

In 2005, Auchter was hired by the Project's developer to serve as the general contractor on the Project. (Doc. 31 ¶ 12; Doc. 32 ¶ 12). Auchter contracted with the following relevant subcontractors. Blanchard Caulking & Coating ("Blanchard") was hired to furnish dampproofing over the cement masonry units ("CMU") behind the brick masonry at the parking garage. (Doc. 308-2 at 22–23). Cummings Masonry

---

and declined to defend." *Trovillion Const. & Dev., Inc. v. Mid-Continent Cas. Co.*, No. 6:12-cv-914, 2014 WL 201678, at *3, n.2 (M.D. Fla. Jan. 17, 2014) (citing *Coblentz v. Am. Sur. Co. of N.Y.*, 416 F.2d 1059, 1063 (5th Cir.1969)).

Co. ("Cummings") was hired to furnish and install the masonry work including the CMU and brick veneer at the parking garage. (Doc. 308-3 at 22–23). Per the Cummings' contract, this included "all required masonry CMU block, brick, mortar, sand, masonry wall wire reinforcing, flashing, weeps," brick veneer, all wire reinforcing, and all precast concrete lintels. (*Id.*) Sterling Dula Arch. a/k/a Kane Mfr. Corp. ("Kane") was hired to design, furnish, and install the garage screens, balcony railings, and balcony posts. (Doc. 308-4 at 22–23). CECO Concrete Construction, LLC ("CECO") was hired to install the balcony slabs. (Doc. 308-5 at 22–23).

Two years into the Project, on or about April 25, 2007, Auchter informed the Project developer that it was financially unable to complete its work as the general contractor and advised that it was terminating its construction contract with the developer. (Doc. 308-6). The parties agree that by August 2007, the developer and Auchter's sureties (the "Sureties") entered into a Takeover Agreement under which the Sureties would take over the Project, and Skanska USA, Inc. ("Skanska") was substituted in as a contractor in place of Auchter.[3] (Doc. 308-1 at 10–11; Doc. 322 at 7; Doc. 310 at 306). The Takeover Agreement provides that Skanska would enter

---

[3] The Association labels Skanska as a "subcontractor" but does not provide any evidence supporting that Skanska would be a subcontractor rather than assuming the work that was intended to be performed by Auchter. The Takeover Agreement references that Skanska will be an independent contractor to the Sureties but also that Skanska will merely be a subcontractor to the Association, presumably because Skanska was contracting directly with the Sureties and not the Association. (Doc. 310 at 307).

into a completion agreement (the "Completion Agreement") and perform the terms of the original construction contract. (Doc. 310 at 307). Skanska, utilizing Blanchard, Cummings, and Kane, among other subcontractors, subsequently completed the Project, and the Certificate of Occupancy was issued on July 30, 2008. (Doc. 308 at 2, 4; Doc. 308-1 at 9–10; Doc. 205-5).

The parties dispute how much, if any, of the dampproofing, masonry, garage screens, and balcony work was completed at the time of Skanska's takeover in August 2007 and as of the expiration of the relevant Amerisure policies on January 1, 2008. It is undisputed that the Project's Certificate of Occupancy was issued on or about July 30, 2008. (Doc. 308-1, Ex. F). The Project was turned over to the Association's control on or about November 10, 2011. (*Id.* ¶ 50).

It is undisputed that the Association's discovery of defects occurred years after the Amerisure policies expired on January 1, 2008. The earliest record evidence includes the identification of issues in the Turnover Evaluation Report issued on April 26, 2013, which identified certain construction deficiencies at the Project following inspections that had occurred in 2012 and 2013. (Doc. 308-22).

The Association observed various issues as follows: in 2012, rubber gaskets on the aluminum balcony railings were deteriorating and were replaced pursuant to work orders (Doc. 308-33, Deposition of Thamir Massraf ("Massraf. Dep.") at 34–39; Doc. 308-34); in 2013, anchoring cement utilized at some balcony railing posts

showed signs of weathering (Doc. 308-22); and in 2016, the Association observed cracking and spalling in the brick veneer and CMU work performed by Cummings. (Doc. 308-23 at 6, 18-23, 308-24 at 12, 35, 44).

There were more formal inspections in 2016 and 2020 from which the Association determined that Cummings' work was defective and caused the brick veneer to crack. (Doc. 308-24 at 49; Doc. 308-27 at 7–8). In 2020, the brick veneer was removed to inspect the CMU, which was determined to have been defectively installed and resulted in an exposed rebar. (Doc. 308-11, Deposition of Ronald Woods ("Woods Dep.") at 128:20–22; Doc. 308-28 at 10–11; Doc. 308-26, Deposition of John Jordan ("Jordan Dep.") at 60). As a result, Amerisure contends that the surface corrosion of the rebar was caused by the inadequate concrete cover— work performed by Cummings. (Doc. 308-25, Woods Dep. at 73; 308-29 at 11; 308-30, Deposition of Brett Newkirk ("Newkirk Dep.") at 155–156). In contrast, the Association maintains that the rebar corrosion was caused by the defective dampproofing—work performed by Blanchard. (Doc. 308-26, Jordan Dep. at 60; Doc. 322 at 15). Also in 2020, the Association discovered there was an absence of dampproofing over certain areas of the CMU. (Doc. 308-27 at 10). Amerisure contends that the Association failed to conduct any follow up testing to determine the cause or the timing of the rebar corrosion and whether (and when) it was caused by dampproofing failures versus inadequate concrete cover. (Doc. 308 at 7).

The Association contends that the garage screens had to be removed because of the defective dampproofing work in order to fix the dampproofing defects. (Doc. 322 at 19). However, Amerisure maintains that the garage screens were defective themselves and that is why they needed to be removed and replaced. (Doc. 308 at 8; Doc. 308-12 at 29). As for defects with the balcony railings, the Association contends that the balcony railings have "waterproofing issues" at the guard rail that resulted in water intrusion and corrosion, (Doc. 308-11, Woods Dep. at 3, 133–36; Doc. 308-23 at 66–68), and that the railings needed to be removed because of this (Doc. 322 at 19). Amerisure maintains that the balcony railings were defective themselves and there is no evidence of damage to another Project component resulting from the balcony railings. (Doc. 308 at 9).

The timing of when the various scopes of work were completed is relevant to the *Coblentz* analysis. The evidence shows that the masonry work performed by Cummings was not completed before Skanska took over—this work was performed and finished by December 2007. (Doc. 322 at 17). The parties dispute when the dampproofing work was performed. Amerisure, relying on pay applications, maintains it was performed primarily from June 2007 to December 2007 and was not 100% complete until April or May of 2008. (Doc 308-32). In contrast, the Association maintains that the dampproofing work was started and nearly completed before Auchter's default; the Association emphasizes that the dampproofing must

be complete before the masonry work could be completed, which was primarily completed by December 2007. (Doc. 322 at 15–17; Newkirk Dep. at 70). The garage screens were not installed until December 2007 and not completed until May 2008, during Skanska's control. (Doc. 308 at 8; Doc. 308-16; Doc. 308-32). Further, the parties dispute the timing of the balcony railing install but seem to agree that this occurred after Auchter's April 2007 default and Skanska's August 2007 takeover.[4] The pay applications show the balcony railings were 45% complete in November 2007 and 100% by April 2008. (Doc. 308-13 at 7, 9, 11, 16).

## II.   The Underlying Lawsuit

On July 23, 2013, the Association sued Auchter, Skanska, and the Sureties, among others, who brought in as third-party defendants Blanchard, Kane, Cummings, CECO, and various other subcontractors in the Underlying Lawsuit alleging that construction deficiencies were caused by Auchter, Skanska, their subcontractors, and the Sureties. (Doc. 308-17; Doc. 31 ¶ 17, Doc. 32 ¶ 17). Auchter tendered the underlying complaint and second amended complaint to Amerisure separately as each complaint was filed.[5] In response to each tender, Amerisure

---

[4] The Association maintains that the railings were 90–92% complete by the end of 2007 according to pay applications (Doc. 322 at 17), but Amerisure maintains that the balcony railings were still being installed in February 2008 and completed in May 2008 citing to pay applications and photographs of ongoing work. (Doc. 308-4 at 21; Doc. 308-13; Doc. 308-32; Doc. 308-16). Both parties rely on pay applications, and Amerisure also submits photographs of the railing install.

[5] The tenders of the original and second amended complaints were on September 27, 2013

denied its duty to defend finding that there was no coverage under its policies.[6] It is undisputed that in the Underlying Litigation, Auchter did not tender the operative Third Amended Complaint ("TAC") to Amerisure. (Doc. 308-20; Doc. 308-21, Deposition of M. Garvin ("Garvin Dep.") at 114:15–17). It is also undisputed that the TAC is the operative complaint for purposes of the Court's *Coblentz* analysis.

The claims brought against Auchter in the operative TAC include breach of performance bond, breach of implied warranties, breach of statutory warranties, violations of Florida's building code, negligence, and breach of contract. (Doc. 308-1). The defects that the TAC relied on as grounds for each of the foregoing claims brought against Auchter included the above-discussed deficiencies with the dampproofing, masonry work, garage screens, and balcony railings but also many other construction deficiencies, such as failure to properly design the Project, defective stucco, defective roof flashing, defective post-tension cables, defective window systems, improper mechanical system design, and defective concrete floors. (Doc. 308-1 at 15–18). It is undisputed that the Association failed to bring a vicarious liability claim against Auchter for the liability of Auchter's subcontractors. Skanska was also sued for the same claims and construction deficiencies as Auchter, except

---

and June 9, 2016. (Doc. 31 ¶¶ 34, 38); (*See also* Doc. 195-2; Doc. 195-4; Doc. 195-6; Doc. 195-8; Doc. 195-10; Doc. 195-13).

[6] Amerisure declined coverage in responsive correspondence in October 2013, January 2014, and November 2016. (Doc. 31 ¶¶ 35, 37, 39).

that a breach of contract claim was brought only against Auchter. (Doc. 308-1).

### III.    Global Settlements and the *Coblentz* Agreement

On December 23, 2020, the Association, Skanska, the Sureties, and many other defendants entered into a nearly global settlement in the amount of $39.5 million. (Doc. 308-36). Relevant here, Skanska settled for $1.5 million, Cummings settled for $2.125 million for the masonry work, CECO settled for $3.25 million for balcony slabs issues, and Blanchard settled for $250,000 for the dampproofing work. (*Id.*). Thereafter, on July 6, 2021, by way of a *Coblentz* agreement, a final consent judgment was entered against Auchter for $8.5 million plus a $150,000 initial payment due immediately (the "*Coblentz* Agreement"). (Doc. 308-37). The *Coblentz* Agreement stated that it was intended to "avoid further expense in prosecuting and defending [the underlying lawsuit.]." (*Id*. at 8). The *Coblentz* Agreement included the following allocation: $1.8 million for dampproofing, $4 million for balcony railings and garage screens, $350,000 for design and contract administration of hazardous material removal, $2.2 million for attorney's fees and costs, and $150,000 prejudgment interest. (*Id*.). Notwithstanding claims brought against Auchter related to defective stucco, roofs, windows, and other issues, the Consent Judgment and *Coblentz* Agreement do not allocate any damages for these claims. (*See id.* at 23).

After entry of the consent judgment against Auchter, the Association settled with Kane, the subcontractor responsible for the balcony rails and garage screens,

for $4 million—the exact amount allocated to the balcony issues in the *Coblentz* Agreement. (Doc. 308-42). In this lawsuit, the Association seeks the entirety of the $8.5 million *Coblentz* award. (Doc. 31 ¶ 1). The Association maintains all $8.5 million is covered under Amerisure's policies. (*See id.* at 10, 12).

## IV.    The Applicable Insurance Policies

Auchter had Commercial General Liability ("CGL") policies with Amerisure in effect from January 1, 2006 to January 1, 2008 (the "Amerisure Policies"). (Doc. 308-7; Doc. 308-8). The Amerisure Policies provide "that Amerisure will pay those sums that the insured becomes legally obligated to pay [as] damages because of 'property damage' caused by an 'occurrence' during the policy periods of the Amerisure CGL Policies." (Doc. 193 at 8–9; Doc. 193-10; Doc. 193-11).

## DISCUSSION

## I.    Legal Standard

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must satisfy this initial burden by "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Norfolk S. Ry. Co. v. Groves*, 586 F.3d 1273, 1277 (11th Cir. 2009) (quoting *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986)). In response, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 256 (1986) (citation omitted). The movant is entitled to summary judgment where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323. In deciding whether to grant summary judgment, the Court resolves all ambiguities and draws all permissible factual inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255; *Shotz v. City of Plantation, Fla*., 344 F.3d 1161, 1164 (11th Cir. 2003) (citation omitted).

Federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Mia. Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices." (citation and quotation marks omitted)). Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead [will] accept [the nonmoving party's] version of the facts drawing all justifiable inferences in [the nonmovant's] favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008). However, "[t]here is [still] no genuine issue for trial unless the

nonmoving party establishes, through the record presented to the court, that [it] is able to prove evidence sufficient for a jury to return a verdict in [its] favor." *Cohen v. United Am. Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir. 1996).

## II. *Coblentz* Framework

"In Florida, a party seeking to recover under a *Coblentz* agreement must prove: (1) coverage; (2) a wrongful refusal to defend; and (3) that the settlement was objectively reasonable and made in good faith." *Sinni v. Scottsdale Ins. Co.*, 676 F. Supp. 2d 1319, 1324 (M.D. Fla. 2009), *as amended* (Jan. 4, 2010); *see also Horn v. Liberty Ins. Underwriters, Inc.*, 391 F. Supp. 3d 1157, 1159 (S.D. Fla. 2019), *aff'd*, 998 F.3d 1289 (11th Cir. 2021). "Florida law clearly states that liability of an insurer depends upon whether the insured's claim is within the coverage of the policy. This remains true even when the insurer has unjustifiably failed to defend its insured in the underlying action." *Spencer v. Assurance Co. of Am.*, 39 F.3d 1146, 1149 (11th Cir. 1994). "A determination of coverage, therefore, is a condition precedent to any recovery against an insurer." *Id.*

The party seeking recovery has the burden "to allocate the settlement amount between covered and uncovered claims." *Trovillion Const. & Dev., Inc. v. Mid-Continent Cas. Co.*, No. 6:12-cv-914, 2014 WL 201678, at *8 (M.D. Fla. Jan. 17, 2014). "[A]n insurer faced with a *Coblentz* action has the right to litigate its contractual duty to indemnify on the actual facts of the underlying litigation just as

it would in an action against its insured." *Sinni,* 676 F. Supp. 2d at 1331. Once the party seeking to recover under a *Coblentz* agreement has established coverage and allocated damages amounts between covered and uncovered claims, the burden shifts to the defendant who must then prove that either the *Coblentz* agreement was unreasonable or was negotiated in bad faith. *Bond Safeguard Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*., No. 6:13-cv-561, 2014 WL 5325728, at *6 (M.D. Fla. Oct. 20, 2014), *aff'd*, 628 F. App'x 648 (11th Cir. 2015).

In this case, although the Court finds that there are some disputed questions of fact relating to whether there is coverage for some of the damages, the Court ultimately finds that the Association has failed to satisfy its burden allocating amounts between covered and uncovered claims and failed to show there was a duty to defend. The Court also agrees that the *Coblentz* Agreement was unreasonable. Accordingly, the Court finds that summary judgment in favor of Amerisure is appropriate.

## III.    Coverage Under the Policy

To establish coverage under the Amerisure Policies, the Association must be able to show that there was "property damage" caused by an "occurrence" during the Amerisure Policies' effective dates. (Doc. 308-7; Doc. 308-8). The Amerisure Policies define "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property" and the "[l]oss of use of tangible

property that is not physically injured." (Doc. 308-7 at 27; Doc. 308-8 at 27). The Amerisure Policies include exclusions for "'[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'" (*Id*. at 16–17). The "your work" exclusion does not apply "if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." (*Id*.)

Under Florida law construing the same or nearly identical provisions, the Amerisure Policies provide coverage for damage to the completed Project caused by Auchter's negligent work, but do not provide coverage for the repair of the defective subcontractor work standing alone. *See Amerisure Ins. Co. v. Auchter Co.*, No. 3:16-cv-407, 2018 WL 4293149, at *11 (M.D. Fla. Mar. 27, 2018). In Florida, a subcontractor's defective work constitutes an "occurrence" under a CGL policy such as those at issue here. *Amerisure Ins. Co. v. Auchter*, 673 F.3d 1294, 1303 (11th. Cir. 2012). While it remains unsettled law in Florida whether damage occurs when the injury-in-fact occurs or when the damage manifests, in *Carithers*, the Eleventh Circuit reasoned that "property damage occurs when the damage happens, not when the damage is discovered or discoverable." *Carithers v. Mid-Continent Cas. Co*., 782 F.3d 1240 (2015). Here, neither party seems to be arguing that the damage "occurred" when it was discovered (which is clearly beyond the Amerisure Policies'

effective dates), so the Court will analyze the issues under the "injury-in-fact" analysis used by the Court in *Carithers*.

The parties dispute whether there was an occurrence within the Amerisure Policies' effective period, and whether the Association seeks coverage for damage to non-defective property. The parties' briefing was poorly organized and jumbled making it difficult to decipher coverage arguments from exclusion arguments. The Association argued coverage under both Coverage A and Coverage E, but the Association only alleged in its operative complaint coverage under Coverage A, Products Completed Operations Hazard.[7] (Doc. 31 ¶ 27 (referring only to PCOH coverage)). The Court agrees that because Coverage E was not alleged in the operative Complaint or brought up during discovery, the Association cannot now raise this coverage claim for the first time on summary judgment. (Doc. 317 at 14); *Gilmour v. Gates, McDonald & Co*., 382 F.3d 1312, 1315 (11th Cir. 2004).

In *Amerisure v. Auchter*, the Eleventh Circuit analyzed an identical CGL policy with PCOH coverage to that of the Amerisure Policies at issue here. 673 F.3d at 1303–10. The *Auchter* Court reaffirmed that "[c]laims solely for the costs of

---

[7] Amerisure argues that the Association has not even established that PCOH coverage would be applicable because Auchter did not complete the Project, and if any defects occurred, they occurred while Auchter was still performing operations. (Doc. 338 at 10–11). If Auchter abandoned the Project, Amerisure maintains that coverage still would not apply because Exclusion j(2) provides that there can be no property damage arising out of an abandoned premises. The Association does not clearly address this argument, and the Court need not address it here because other issues dispose of the case.

repairing and replacing the actual defects in . . . construction are not covered under CGL policies." *Id*. at 1304; *see also S.-Owners Ins. Co. v. MAC Contractors of Fla., LLC*, 819 F. App'x 877, 881 (11th Cir. 2020) (holding that plaintiffs "could not recover for damage to brick caused by the negligent application of brick coating or damage to tile caused by defective installation because the damage to the brick and the tile was 'part of the sub-contractor's work,' and this defective work caused no damage apart from the defective work itself").

While CGL policies do not cover a claim solely for repairing defective work, they will cover a claim for repairing damage to the non-defective portions of a completed project caused by the defective work. *Auchter*, 673 F.3d at 1304 ("[T]here is a difference between a claim for the costs of repairing or removing defective work, which is not a claim for 'property damage,' and a claim for the costs of repairing damage caused by the defective work, which is a claim for 'property damage.'"); *Bradfield v. Mid-Continent Cas. Co*., 143 F. Supp. 3d 1215, 1235 (M.D. Fla. 2015) ("[T]he mere inclusion of a defective component, such as a defective window or the defective installation of a window, does not constitute property damage unless that defective component results in physical injury to some other tangible property."). Additionally, there is coverage for the costs to repair defective work if repairing such work is necessary to prevent further damage to non-defective components of the project that would continue to be damaged without the repair. *Auchter*, 2018 WL

4293149, at *14 (citing *Carithers*, 782 F.3d at 1250). It is not the value of the damage to other non-defective property that matters, but "the fact of property damage to other property" that would trigger insurance coverage. *Auchter*, 2018 WL 4293149, at *14.

There are several coverage issues here some of which could not be resolved on summary judgment if the issues were presented in isolation and separate from a *Coblentz* analysis.[8] This case involves at least two, if not several, occurrences, some of which present factual issues relating to both causation and the underlying reason for the repairs. For example, there is evidence that both the dampproofing performed by Blanchard and the CMU and brick veneer masonry work performed by Cummings are defective. While the Association maintains that the defective dampproofing caused water intrusion resulting in corrosion of the rebar (damage to a non-defective component of the Project)[9] (Doc. 322 at 15; Doc. 297 at 70),

---

[8] Amerisure argues that various exclusions apply, and Amerisure has the burden of proving an exclusion. *Carithers*, 782 F.3d at 1250. One such exclusion is the "your work" exclusion. "[T]he 'your work' exclusion, states that insurance does not apply to 'property damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'" *J.B.D. Const., Inc. v. Mid-Continent Cas. Co.*, 571 F. App'x 918, 924–25 (11th Cir. 2014). The Court need not determine whether any exclusions apply because the existence of coverage cannot be established on the record at this stage, and there should be a finding of coverage before considering whether an exclusion would apply. However, the Amerisure Policies contained the subcontractor exception to the "your work" exclusion which would likely render the "your work" exclusion inapplicable in this case. "As to the 'Your Work' exclusion, '[b]y incorporating the subcontractor exception into the 'your-work' exclusion, the insurance industry specifically contemplated coverage for property damage caused by a subcontractor's defective performance.'" *Auchter*, 2018 WL 4293149, at *24.

[9] The Eleventh Circuit has recognized that the commencement of rust (corrosion) is

---

Amerisure contends that the Association noticed defects with the brick veneer first, and that these defects are the cause of water intrusion and damage to the rebar, not the dampproofing. (Doc. 308 at 6). Neither party identifies which contractor installed the rebar, but it appears to be included within Cummings' scope of work outlined in the Cummings contract. If Cummings' own defective work damaged work also performed by Cummings, there may not have been "property damage." *Auchter* 673 F.3d at 1300 (reasoning that "a claim for 'property damage' requires physical injury to some tangible property other than the contractor's own defective work"). Similarly, Amerisure claims that the garage screens were themselves defective and that the damages associated with them are simply damages to repair defective work, which is not covered. (*Id.*) In contrast, the Association claims that the garage screens had to be removed as part of the brick removal to access the defective dampproofing and that this work is covered because it was required to be done to remedy the dampproofing defects. (Doc. 322 at 19).

Setting aside these disputed factual issues regarding "cause-and-effect" and whether certain components were "defective themselves" versus "damaged due to other defects," the major coverage hurdle is whether there is insurance coverage for

---

covered property damage under CGL policies. *Trizec Props., Inc. v. Biltmore Constr. Co.*, 767 F.2d 810 (11th Cir. 1985).

defective work performed after Auchter's default and under Skanska.[10] If there is no coverage for work performed under Skanska, there is no coverage for the balcony railing damages.[11] While the parties dispute the timing of the balcony railing install by a matter of months, there is no record evidence that the balcony railing install began prior to August 2007 when Skanska took over. Most of the install, if not all of it, occurred from November 2007 to April 2008.[12] Additionally, the evidence shows that the balconies themselves were defective,[13] so it matters when they were installed.

---

[10] "Although an 'occurrence' need not necessarily take place during the policy period, 'property damage' must occur during the policy period." *Mid-Continent Cas. Co. v. Frank Casserino Const., Inc.*, 721 F. Supp. 2d 1209, 1215–16 (M.D. Fla. 2010). There is no evidence of damage caused by any alleged defects prior to completion of a particular scope of work. For example, no evidence that dampproofing defects caused damage to the rebar before the dampproofing install was complete, and no evidence the balcony rails caused damage before their install was complete.

[11] Additionally, if the water intrusion to the rebar in areas impacted by the dampproofing and/or masonry defects is determined to be caused by defective CMU and brick veneer work, as opposed to the dampproofing work, there would be a timing issue as well because Cummings performed masonry work under Skanska towards the end of 2007 after Skanska took over. However, because the balcony railings were clearly performed under Skanska, the Court will focus only on this issue for purposes of this analysis, as it is dispositive.

[12] Amerisure argues they were being installed in February 2008 and completed in May 2008, long after Auchter's default. (Doc. 308 at 31). The Association maintains the balcony railings were 90-92% installed by "end of 2007." (Doc. 322 at 17).

[13] The Association maintains there were "waterproofing issues" at the balcony guardrail that resulted in water intrusion and corrosion to the rebar that occurred while they were being installed. (Doc. 301-1 at 3–5; Doc. 301-9, Woods Dep. 134:16–136:23). In contrast, Amerisure argues that the balcony railings had to be removed and replaced only because they were defective themselves. (Doc. 338 at 8). The Association asserts that its expert recommended the railings be removed and replaced because of "defective waterproofing" but the Association does not clarify what type of waterproofing. (Doc. 320-3 at 3–4). The Association cites to its expert Mr. Woods's report which explains that the balcony rails were defectively installed, and also the water intrusion

Amerisure argues that neither Skanska nor the Sureties qualify as insureds or
additional insureds under the Amerisure Policies. (Doc. 308 at 16). In response, the
Association merely argues that Auchter's duties and liability are established by the
construction contract and the performance bond, and that Amerisure lost the ability
to dispute Auchter's liability when it refused to provide a defense. (Doc. 322 at 6).
The Association contends that Auchter remained responsible for completing the
Project even after its default because, as part of the original contract, Auchter, agreed
to execute the work as outlined by the construction documents. (*Id.* at 7).

The Association's argument is misplaced as it conflates the issue of Auchter's
contractual liability with that of insurance coverage. It is undisputed that Auchter
terminated the original construction contract, Auchter ceased work on the Project,
and that subsequent documents, including the Takeover Agreement and Skanska's
completion contract, were executed by the Sureties and Skanska. These agreements
are not at issue here. The issue is one of insurance coverage. Even so, the Court is
not persuaded that Auchter remained the only liable party, as Skanska, an entirely
separate and unrelated party, stepped in to complete the Project. A performance

---

issues resulted from the grout pockets that were required to be waterproofed. (*Id.*). There is no
indication that anyone other than the balcony installer, Kane, was responsible for this
waterproofing issues. Mr. Woods further states that "[t]he defective condition occurred at the
original construction as the railings were being improperly installed" and that the damage begins
to occur at the time the defective construction is in place. *Id.* Therefore, the defects associated with
the balcony railings and any subsequent damage to the non-defective rebar occurred when Kane
installed them either under Skanska's control or after the January 1, 2008 policy expiration date.

bond, which is what obligated the Sureties to step in and hire Skanska, is intended
to protect the Association by ensuring continued performance of a construction
contract in the face of Auchter's default. *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So.
2d 871, 887 (Fla. 2007) ("[U]nlike an insurance policy, a performance bond benefits
the owner of a project rather than the contractor."). But the Association is standing
in the shoes of Auchter in this lawsuit, seeking to recover from its insurer. The
Association has not offered legal support for its contention that a performance bond
would extend the insurance coverage of the defaulting party to cover work
performed by a substitute contractor once the Sureties step in. While it may be true
from a contractual perspective that Auchter faced continued contractual liability to
the developer beyond its default, the Association's burden in this case is really to
show that the language of the Amerisure Policies themselves extended coverage for
work under Skanska.

The Association does not address Amerisure's argument that Skanska was not
an additional insured under the Amerisure Policies. Instead, the Association vaguely
argues that Skanska was an agent of Auchter (*see* Doc. 322 at 7), but there is no
factual or evidentiary support for such a conclusion. The Association also argues
that the definition of "your work" under the Amerisure Policies' coverage provisions
includes work performed on the insured's behalf. (*Id.* at 7–8). But the record
evidence does not support that Skanska and Auchter had any relationship or that

Skanska was working for or on behalf of Auchter. There is no evidence that Auchter was involved in the Surety's decision to retain Skanska or had any control over the methods Skanska employed to complete the Project. The Court cannot conclude that Skanska was a subcontractor or agent to Auchter or that Skanska's work was insured under Auchter's insurance policies.

Since the Association has failed to show that Skanska is an additional insured under the Amerisure Policies or that there is coverage for defects arising out of Skanska's work after it took over, there is no coverage for the balcony railings damages. Even though there are some factual disputes relating to coverage for the dampproofing and defective masonry work, because the balcony railings were installed under Skanska, not Auchter, the Association has not shown that there is sufficient evidence to support coverage for the $4 million sought for these defects (the railings were lumped with the garage screens and there is no further allocation). Accordingly, the Association has not shown that there is coverage for all the damages amounts sought in the *Coblentz* Agreement.

## IV.    Allocation of the *Coblentz* Agreement

The Association, as the party seeking recovery, has the burden "to allocate the settlement amount between covered and uncovered claims," which includes "both temporal and categorical allocation." *Trovillion*, 2014 WL 201678, at *8. The agreement itself need not include the necessary allocation between covered and

uncovered claims, the claimant can allocate independently of the agreement. *Highland Holdings, Inc. v. Mid-Continent Cas. Co*., No. 8:14-cv-1334-SDM-TBM, 2016 WL 3447523, at *4 (M.D. Fla. June 23, 2016), *aff'd,* 687 F. App'x 819 (11th Cir. 2017). "Inability to allocate precludes recovery." *Trovillion*, 2014 WL 201678, at *8; *J.B.D. Const., Inc. v. Mid-Continent Cas. Co*., 571 F. App'x 918, 928 n. 7 (11th Cir. 2014) ("Under Florida law, [the insured] has the burden of allocating the settlement amount between covered and uncovered claims and the inability to do so precludes recovery."); *Keller Indus. v. Empl. Mut. Liab. Ins. Co*., 429 So. 2d 779, 780 (Fla. 3d DCA 1983) (affirming the lower court's refusal to award damages under the insurance contract based on a settlement entered into by the insured because "as the party claiming coverage, [the insured] had the burden, which it failed to carry, to apportion damages and show that the settlement, or portions thereof, represented costs that fell within the coverage provisions of the policy").

As outlined above, the *Coblentz* Agreement includes $4 million in damages including the balcony railing defects, but the Association has not proven that there is coverage under the Amerisure Policies for this amount. As a result, the Coblentz Agreement is unenforceable because it does not properly allocate between covered and uncovered claims.

Moreover, the claims brought against Auchter in the Underlying Lawsuit included claims and defects beyond those expressly mentioned here, claims that do

not appear to be covered. For example, the TAC alleged claims for building code violations and breach of contract, and it also sought recovery for extensive defects relating to stucco, roofing, and windows that were not even mentioned or addressed in the *Coblentz* Agreement. (Doc. 308-1 ¶¶ 56, 58, 150, 158); *see Trovillion*, 2014 WL 201678, at *8 (finding a *Coblentz* agreement unenforceable in part where the agreement subjected the insured to liability beyond the scope of the policy at issue and reasoning that the agreement expressly stated it was intended to resolve the legal exposure faced by the insured). The language of Auchter's and the Association's *Coblentz* Agreement makes clear that the agreement is intended to be "in full resolution of the Litigation" in the amount of $8.5 million. (Doc. 308-37). The agreement further states that the total $8.5 million amount "includes" various amounts for the dampproofing, railings and garage screens, and design and contract administration of Phase 1 hazardous material removal, fees and costs and prejudgment interest. (*Id.* at 9). But in order to settle all the claims against Auchter, the agreement should have allocated amounts for uncovered claims as well, such as non-covered claims for building code violations and defects relating to stucco, the roofs, and the windows.

The Association also does not address in its briefing the $350,000 for design and contract administration of Phase 1 hazardous material removal for which it seeks

recovery in this lawsuit.[14] It is the Association's burden to show that the $350,000 for hazardous waste removal is a covered claim under the Amerisure Policies, and its failure to do so is fatal to its claim. *Bradfield*, 143 F. Supp. 3d at 1248 (emphasizing that it is not the Court's burden to dig through the record and assist the claimant with its required allocation between covered and uncovered claims).

## V.    Duty to Defend

The Court will briefly address the duty to defend. "Under Florida law, an insurance provider's duty to defend an insured party 'depends solely on the facts and legal theories alleged in the pleadings and claims against the insured.'" *Stephens v. Mid-Continent Cas. Co*., 749 F.3d 1318, 1323 (11th Cir. 2014). An insurer has a duty to defend "when the relevant pleadings allege facts that 'fairly and potentially bring the suit within policy coverage.'" *Lawyers Title Ins. Corp. v. JDC (Am.) Corp*., 52 F.3d 1575, 1580 (11th Cir. 1995). "Thus, an insurer is obligated to defend a claim even if it is uncertain whether coverage exists under the policy." *Stephens*, 749 F.3d at 1323. Any doubt about whether the insurer owes a duty to defend must be resolved against the insurer and in favor of the insured. *MAC Contractors*, 819 F. App'x at 879.

---

[14] Amerisure says these are costs incurred in the context of replacing faulty work such as the defectively installed brick veneer and non-compliant garage screens. (Doc. 308 at 24).

Amerisure argues that because the Association failed to tender the operative TAC to it, the Association cannot later recover under a *Coblentz* agreement arising out of that complaint. (Doc. 308 at 13–14). In response, the Association maintains that it tendered to Amerisure the original complaint and the second amended complaint and sent correspondence to Amerisure following its continuously denying the duty to defend. (Doc. 322 at 1–2). Notably, Amerisure contends that "[t]he TAC differs materially from prior pleadings as it contains new claims by the Association– as an assignee of the Developer–against Auchter, which form the basis of the Association's claims against Amerisure." (Doc. 338 at 2).

Neither party provides an analogous case holding an insurer liable under a *Coblentz* Agreement where it is undisputed that the insurer was not tendered the operative complaint that resulted in a *Coblentz* agreement and consent judgment. The notice issues involved here are concerning. Even though Amerisure received prior versions of complaints and engaged in back-and-forth communication with Auchter's counsel regarding its declining to defend based on the allegations of those complaints, it remains undisputed that the TAC was never provided to Amerisure. The parties agree that the *Coblentz* analysis and the duty to defend prong specifically look only to the TAC. *Landmark Am. Ins. Co. v. N. Captiva Island Club, Inc*., No. 2:16-cv-582, 2016 WL 7440846, at *1 (M.D. Fla. Dec. 27, 2016) ("[W]hen an original complaint has been superseded by an amended complaint, the original

complaint can no longer furnish a basis for determining the insurer's duty to defend."). Thus, the versions of the underlying complaint that Amerisure actually received are legally irrelevant to the present analysis.

In the context of a *Coblentz* agreement and in the absence of legal support for the Association's position, the Court declines to hold the insurer liable for significant settlement amounts derived from a settlement agreement the insurer did not participate in and which settled claims derived from a complaint it is undisputed the insurer did not receive—a complaint which forms the basis of the duty to defend inquiry now. *Sinni*, 676 F. Supp. 2d at 1329 (finding exceptional circumstances warranted relieving the insurer of its duty to defend). The Court cannot simply speculate that Amerisure would have denied the defense because it did in response to prior versions of the complaint. There is insufficient legal or factual support on the record for that hypothetical conclusion.[15] As a result, there was no wrongful refusal to defend.

---

[15] Additionally, the Association contends that Amerisure failed to comply with § 627.426, Fla Stat., and therefore, cannot rely on a coverage defense now, such as not receiving notice of the TAC, in this litigation. (Doc. 322 at 2). The Court finds these arguments misplaced. *Horn*, 391 F. Supp. 3d at 1166 (finding § 627.426 inapplicable to an insured's burden to enforce a *Coblentz* agreement); *Petro v. Travelers Cas. & Sur. Co. of Am.*, 54 F. Supp. 3d 1295, 1305 (N.D. Fla. 2014) ("[T]he Claims Administration Statute, Fla. Stat. 627.426, applies only to preclude particular coverage defenses and is therefore not relevant to a determination of whether there is a valid *Coblentz* agreement.").

The Association requests to recover for costs and fees under the supplementary payments provision for breach of the duty to defend but does not cite any case law applying this provision outside of a *Coblentz* agreement analysis. (Doc. 310 at 21). This case is governed by the *Coblentz* framework, and there is no separate damages award for establishing only a breach of the duty to defend. *Spencer*, 39 F.3d at 1149 (finding that under *Coblentz*, the liability of an insurer depends entirely on coverage even if the court were to find an "unjustifiable" failure to defend); *Horn*, 391 F. Supp. 3d at 1166 (finding that no coverage precluded recovery of settlement and defense costs). Because the Association has not satisfied its *Coblentz* burden, the Court need not award attorney's fees nor address the reasonableness of the fees' allocation. For these reasons, the Association's Motion for Partial Summary Judgment will be denied.

## V.    Reasonableness of *Coblentz* Agreement

The inquiry could end here as the Court has found that the Association has not satisfied its burden to allocate between covered and uncovered claims and that there was no wrongful refusal to defend. Nonetheless, the Court finds it worthwhile to make note of some concerns regarding the reasonableness of the amounts included in the *Coblentz* Agreement. "What *Coblentz* does not do is authorize the insured to indiscriminately load the carrier's wagon with bricks of damage that no reasonable person would expect as consequences of the underlying claim." *Bond Safeguard*,

2014 WL 5325728, at *9. Therefore, to prevent such abuse by the insured, Florida applies a reasonableness requirement, and the Court determines "what a prudent person in the position of the [insured] would have settled for on the merits of plaintiff's claim." *Id*.

The *Coblentz* Agreement is not reasonable because it does not account for Skanska's liability and instead lumps all damages on Auchter despite evidence that Skanska continued in place of Auchter for a nearly 12-month period when many portions of the Project were not yet complete. The agreement included the total damages for the balconies, dampproofing, masonry work, and garage screens despite that some of this work was performed under Skanska. Moreover, despite Skanska being sued for nearly identical claims and the same defects as Auchter and serving as a contractor on the Project for nearly a year, the Association settled with Skanska for only $1.5 million—less than 20% of the amount the Association agreed to settle with Auchter. Amerisure also points out that the Association accepted the settlement sum of $250,000 from Blanchard, the dampproofing subcontractor, despite that the Association now contends that the recovery of millions of dollars of damages in the *Coblentz* Agreement are covered because of Blanchard's dampproofing deficiencies. Moreover, before the Association brought this lawsuit, the Association settled with Kane, the balcony and garage screen contractor, for $4 million, which is the exact

amount of which Auchter agreed to settle the balcony and garage screen claims against Auchter in the *Coblentz* Agreement.[16]

Additionally, Amerisure argues that it is not reasonable to include damages for Auchter's vicarious liability for Kane in the *Coblentz* Agreement because the TAC did not allege that Auchter was vicariously liable for Kane (or anyone else), and it would be unreasonable to recover for a nonexistent claim. (Doc. 308 at 17). Florida law requires a claim for vicarious liability to be specifically alleged in order to hold a party vicariously liable. *See Goldschmidt v. Holman*, 571 So. 2d 422, 423 (Fla. 1990). The claims actually brought against Auchter are the essential framework for purposes of the settlement of those claims. Accordingly, on the face of the *Coblentz* Agreement, and simply considering the above undisputed facts without digging into additional evidence of arms-length negotiations and bad faith, it appears that this agreement was an effort to unfairly and unreasonably load Amerisure's "wagon with bricks of damage" based on Auchter's fault where Auchter is just one responsible party among many others from whom the Association has already recovered tens of millions of dollars. *Bond Safeguard*, 2014 WL 5325728, at *9.

---

[16] Interestingly, the Association's own document entitled "Coblentz Analysis" lists Kane as separately responsible from Auchter, and tags Kane with all the exposure and damages relating to the garage screens and the balcony railings. (Doc. 308-40). The listed damages "attributable to Auchter" do not include the garage screens or the balcony railings. (*Id.*)

Based on the foregoing, the Court finds that there are no disputed questions of fact precluding the Court from entering summary judgment in favor of Amerisure finding that the Association has failed to put forth enough evidence to avoid summary judgment on its claims brought under the *Coblentz* Agreement. It is **ORDERED** as follows:

1.    Amerisure's Motion for Summary Judgment Against Plaintiff (Doc. 308) is **GRANTED**.

2.    The Association's Motion for Partial Summary (Doc. 310) is **DENIED**.

3.    The Clerk is directed to enter a judgment providing that Plaintiff the Peninsula at St. John's Center Condominium Association, Inc. shall take nothing on their claims against Defendants Amerisure Insurance Company and Amerisure Mutual Insurance Company. Defendants are entitled to recover the costs of this action.

4.    The Clerk is **DIRECTED** to close the file.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on May 30, 2025.

ANNE C. CONWAY
United States District Judge

**<u>COPIES FURNISHED TO:</u>**
Counsel of Record